# United States Court of Appeals
# for the District of Columbia Circuit

SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION,

*Petitioner,*

v.

CRIMSON OAK GROVE RESOURCES LLC; GREENBRIER MINERALS, LLC; RIVER CITY STONE-DIV/MATHY CONSTRUCTION CO.; AMRIZE CEMENT INC., FORMERLY KNOWN AS HOLCIM (US) INC.; FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION,

*Respondents,*

SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION,

*Petitioner,*

v.

COUNTY LINE STONE CO., INC.; CONSOL PENNSYLVANIA COAL COMPANY, LLC; RAMACO RESOURCES, LLC; FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION,

*Respondents,*

SOREN J. SCHMIDT,

*Court-Appointed Amicus Curiae for Respondents.*

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

## BRIEF OF COURT-APPOINTED AMICUS CURIAE IN SUPPORT OF RESPONDENT FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION'S ORDERS

*(cover continues on inside)*

Soren J. Schmidt[*]
*Counsel of Record*
Patrick D. Powers
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
soren.schmidt@lw.com

*Court-Appointed Amicus Curiae*

December 22, 2025

---

[*]  Supervised by Gregory G. Garre, Partner, Latham & Watkins LLP.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A. Parties and Amici

In *Crimson Oak Grove Resources* (No. 24-1294), the following parties appeared before the Federal Mine Safety and Health Review Commission:

- Secretary of Labor

- Crimson Oak Grove Resources, LLC

- River City Stone-Div/Mathy Construction Company

- Amrize Cement Inc., formerly known Holcim (US) Inc.

- Greenbrier Minerals, LLC

In *County Line Stone Company* (No 24-1357), the following parties appeared before the Federal Mine Safety and Health Review Commission:

- Secretary of Labor

- County Line Stone Co., Inc.

- Consol Pennsylvania Coal Company LLC

- Ramaco Resources, LLC

The following are parties in this Court in these consolidated cases:

- Secretary of Labor

- County Line Stone Co., Inc.

• Consol Pennsylvania Coal Company LLC

• Ramaco Resources, LLC

• Crimson Oak Grove Resources, LLC

• River City Stone-Div/Mathy Construction Company

• Amrize Cement Inc., formerly known Holcim (US) Inc.

• Greenbrier Minerals, LLC

• Federal Mine Safety and Health Review Commission

Soren J. Schmidt was appointed as amicus curiae in support of the respondent Federal Mine Safety and Health Revision Commission's Orders.

**B. Ruling Under Review**

The rulings at issue in this court are the Federal Mine Safety and Health Review Commission's decisions in *Secretary of Labor, Mine Safety & Health Administration v. Crimson Oak Grove Resources LLC, et al.*, FMSHRC Nos. SE 2021-0112, SE 2021-0134, LAKE 2021-0145, YORK 2021-0023, and WEVA 2021-0294 (FMSHRC Aug. 30, 2024), reported at 46 FMSHRC 593 (2024), and *Secretary of Labor, Mine Safety & Health Administration v. County Line Stone Co., et al.*, FMSHRC Nos. YORK 2022-0003, PENN 2021-0108, and WEVA 2022-0260 (FMSHRC Nov. 1, 2024), reported at 46 FMSHRC 924 (2024).

## C. Related Cases

One case involving some of the same parties and presenting an identical issue (as well as a separate issue) is pending in this Court. It is *Secretary of Labor, Mine Safety & Health Administration v. Genesis Alkali, LLC and FMSHRC*, No. 25-1107. It is currently in abeyance pending the disposition of this case.

Another set of consolidated cases involving some of the same parties and presenting similar issues are pending in this Court. They are *Secretary of Labor, Mine Safety & Health Administration v. Knight Hawk Coal, LLC and FMSHRC*, No. 24-1293, *Secretary of Labor, Mine Safety & Health Administration v. Greenbrier Minerals, LLC and FMSHRC*, No. 24-1356, and *Secretary of Labor, Mine Safety & Health Administration* v. *Bluestone Oil Corp. and FMSHRC*, No. 25-1077.

*/s/ Soren J. Schmidt*
Soren J. Schmidt

*Court-Appointed Amicus Curiae*

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ....................................................................vi

GLOSSARY .................................................................................... xiii

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION...........................................................5

ISSUES PRESENTED............................................................................5

STATUTES AND REGULATIONS...........................................................6

STATEMENT OF THE CASE .................................................................6

    A.    The Mine Act's Split-Enforcement Scheme .........................6

    B.    The Proceedings Below.....................................................10

    C.    The Proceedings Before This Court....................................13

SUMMARY OF ARGUMENT ...............................................................15

ARGUMENT ......................................................................................17

I.    THE COURT MAY DIRECT THE COMMISSION TO PRESENT ARGUMENTS ...........................................................17

II.    THE COURT LACKS JURISDICTION OVER THIS APPEAL ................27

III.    THE COURT SHOULD UPHOLD THE COMMISSION'S DECISIONS ...............................................................................37

    A.    The Mine Act Places Judicially Manageable Limits On The Secretary's Discretion ........................................37

        1.    Congress May Constrain An Agency's Prosecutorial Discretion ................................................................38

2.      The Mine Act Limits The Secretary's Discretion To
        Compromise, Mitigate, Or Settle Contested Penalties ............39

B.      Agreements to Vacate Contested Penalties Fall Squarely Within
        Section 110(k) .......................................................................42

C.      The Secretary's Contrary Arguments Fail .........................................46

        1.      Section 110(k) Covers More Than Just Penalty
                Reductions...............................................................................46

        2.      The Commission's Review Does Not Violate The
                Secretary's Nonenforcement Discretion...................................50

CONCLUSION ........................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abney v. United States*,
  431 U.S. 651 (1977)....................................................................................29

*American Forest Resource Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110 (2024)................45

*Baker v. Carr*,
  369 U.S. 186 (1962)...............................................................................22, 23

*Baltimore Gas & Electric Co. v. FERC*,
  252 F.3d 456 (D.C. Cir. 2001)...................................................................40

*Block v. SEC*,
  50 F.3d 1078 (D.C. Cir. 1995)...................................................................39

*Brennan v. OSHRC*,
  502 F.2d 946 (3d Cir. 1974) .....................................................................24

*Brennan v. OSHRC*,
  505 F.2d 869 (10th Cir. 1974) ..................................................................24

*CFTC v. Schor*,
  478 U.S. 833 (1986)..................................................................................45

*Cobell v. Salazar*,
  No. 11-5270, 2012 WL 1884702 (D.C. Cir. May 22, 2012) ..............................23

*Cody v. Cox*,
  509 F.3d 606 (D.C. Cir. 2007)...................................................................40

*Cortes v. National Labor Relations Board*,
  145 F.4th 57 (D.C. Cir. 2025)...........................................................22, 23, 25

*Cuyahoga Valley Railway Co. v. United Transportation Union*,
  474 U.S. 3 (1985)........................................................................12, 51, 52

\* Authorities upon which we chiefly rely are marked with asterisks.

*Dickson v. Secretary of Defense*,
  68 F.3d 1396 (D.C. Cir. 1995) ........................................................40

\* *Digital Equipment Corp. v. Desktop Direct, Inc*.,
  511 U.S. 863 (1994) ........................................... 28, 29, 30, 31, 32, 34, 35, 36, 37

*Donovan v. Occupational Safety & Health Review Commission*,
  713 F.2d 918 (2d Cir. 1983) ...........................................................35

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002) ..........................................................39

*Dunlop v. Bachowski*,
  421 U.S. 560 (1975) ......................................................................39

*Duval Corp. v. Donovan*,
  650 F.2d 1051 (9th Cir. 1981) ........................................................26

\* *Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................... 12, 37, 38, 39, 40, 50

*Hi-Tech Furnace Systems, Inc. v. FCC*,
  224 F.3d 781 (D.C. Cir. 2000) ........................................................38

*Hinson v. National Transportation Safety Board*,
  57 F.3d 1144 (D.C. Cir. 1995) ...........................................19, 20, 21, 22

*Marshall v. Oil, Chemical & Atomic Workers International Union*,
  647 F.2d 383 (3d Cir. 1981) ...........................................................35

*McClendon v. City of Albuquerque*,
  630 F.3d 1288 (10th Cir. 2011) ......................................................31

*Meredith v. FMSHRC*,
  177 F.3d 1042 (D.C. Cir. 1999) ................................................20, 32

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) ......................................................................29

*Mohawk Industries, Inc. v. Carpenter*,
  558 U.S. 100 (2009) ................................................................30, 36

*Moten v. Bricklayers, Masons & Plasterers International Union*,
543 F.2d 224 (D.C. Cir.1976) ............................................................26

*National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012) ..........................................................................39

*National Labor Relations Board v. Constellium Rolled Products
Ravenswood, LLC*,
43 F.4th 395 (4th Cir. 2022) .............................................................25

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ..........................................................................29

*Oil, Chemical, & Atomic Workers International Union v. OSHRC*,
671 F.2d 643 (D.C. Cir. 1982) ........................... 18, 19, 20, 21, 24, 26

*Ricketts v. Adamson*,
483 U.S. 1 (1987) .........................................................................30, 33

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018) ..........................................................................48

*Secretary of Labor v. Twentymile Coal Co.*,
456 F.3d 151 (D.C. Cir. 2006) ................................8, 33, 39, 51, 52

*Secretary of Labor, Mine Safety & Health Administration v.
Consolidation Coal Co.*,
895 F.3d 113 (D.C. Cir. 2018) ...................................................41, 56

*Secretary of Labor, Mine Safety & Health Administration v. Industrial
TurnAround Corp.*,
138 F.4th 1339 (D.C. Cir. 2025) ................................................35, 36

*Seigal v. Merrick*,
590 F.2d 35 (2d Cir. 1978) ...............................................................31

*Seila Law LLC v. Consumer Financial Protection Bureau*,
591 U.S. 197 (2020) ..........................................................................25

*Smith v. United States*,
508 U.S. 223 (1993) ..........................................................................42

*Speed Mining, Inc. v. FMSHRC*,
  528 F.3d 310 (4th Cir. 2008) ...................................................38

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
  600 U.S. 181 (2023)..............................................................22

*Trout Unlimited v. Pirzadeh*,
  1 F.4th 738 (9th Cir. 2021) ...................................................51

\* *United States v. Carrigan*,
  778 F.2d 1454 (10th Cir. 1985) ....................................31, 33, 34

*United States v. FCC*,
  652 F.2d 72 (D.C. Cir. 1980).................................................27

*United States v. Johnson*,
  319 U.S. 302 (1943)........................................................22, 23

*United States v. Samueli*,
  582 F.3d 988 (9th Cir. 2009) ...............................................31, 32

*United States v. Windsor*,
  570 U.S. 744 (2013).............................................................25

*Utah ex rel. Utah State Department of Health v. Kennecott Corp.*,
  14 F.3d 1489 (10th Cir. 1994) ...............................................31

*Weyerhaeuser Co. v. United States Fish & Wildlife Service*,
  586 U.S. 9 (2018)..................................................................38

\* *Will v. Hallock*,
  546 U.S. 345 (2006)...................... 3, 28, 29, 30, 32, 34, 35

## FEDERAL MINE SAFETY AND
## HEALTH REVIEW COMMISSION DECISIONS

*Amax Lead Co. of Missouri*,
  4 FMSHRC 975 (1982).............................................................8

*American Coal Co.,*
38 FMSHRC 1972 (2016)......................................................9, 12, 37, 41, 56

*American Coal Co.,*
40 FMSHRC 983 (2018)........................................................9, 21, 43, 44, 50

*County Line Stone Co.,*
46 FMSHRC 924 (2024).....................................................................10

*Crimson Oak Grove Resources LLC.,*
46 FMSHRC 593 (2024).....................................................................10

*Dickenson Russell Coal Co.,*
35 FMSHRC 519 (2013)......................................................................51

*Hickory Coal Co.,*
14 FMSHRC 1160 (1992)....................................................................44

*Knight Hawk Coal, LLC,*
46 FMSHRC 563 (2024)...........................................................9, 41, 55

*Mechanicsville Concrete, Inc. t/a Materials Delivery,*
18 FMSHRC 877 (1996)..................................................................8, 33

*PC Sand & Gravel,*
32 FMSHRC 235 (2010)......................................................................44

*RBK Construction, Inc.,*
15 FMSHRC 2099 (1993)..................................................12, 13, 33, 51, 53

*Rulon Harper Constr., Inc.,*
44 FMSHRC 671, 679 (2022) ...........................................................44

*Youghiogheny & Ohio Coal Co.,*
7 FMSHRC 200 (1985)...................................................................53, 54

## STATUTES AND REGULATIONS

7 U.S.C. § 2204 ...............................................................................26

10 U.S.C. § 1552(b) .........................................................................40

20 U.S.C. § 3412 ..................................................................26

24 U.S.C. § 413(b) ...............................................................40

28 U.S.C. § 516 ....................................................................26

30 U.S.C. § 801 *et seq* ..........................................................6

30 U.S.C. § 811 ......................................................................7

30 U.S.C. § 813(a) .................................................................7

30 U.S.C. § 814(a) .................................................................7

30 U.S.C. § 814(a)-(e) ..........................................................51

30 U.S.C. § 815 ......................................................................7

30 U.S.C. § 816 ....................................................................34

30 U.S.C. § 816(a)(1) ............................................................7

30 U.S.C. § 816(b) .........................................................27, 34

30 U.S.C. § 820(i) .................................................................41

* 30 U.S.C. § 820(k) .........................................1, 8, 20, 39, 40

30 U.S.C. § 822 ....................................................................26

30 U.S.C. § 823(d)(1) ............................................................7

30 U.S.C. § 823(d)(2)(A)(i) ...................................................7

30 C.F.R. § 100.6 .............................................................8, 51

30 C.F.R. § 100.7(a) ..............................................................7

## OTHER AUTHORITIES

*Black's Law Dictionary* (10th ed. 2014)..............................12

*Black's Law Dictionary* (12th ed. 2024)..............................43

**Page(s)**

Fed. R. Crim. P. 11 ...................................................................30

*Merriam-Webster.com* (last visited Dec. 17, 2025) ...............................12

*Merriam-Webster.com*, https://tinyurl.com/53fpr8cz (last visited Dec. 17, 2025) ...........................................................................42

S. Rep. No. 95-181 (1977) ...........................................6, 7, 8, 45, 49

S. Rep. No. 109-365 (2006) ........................................................45

# GLOSSARY

| Abbreviation/acronym | Description |
| --- | --- |
| ALJ | Administrative Law Judge |
| FMSHRC or Commission | Federal Mine Safety and Health Review Commission |
| Mine Act | Federal Mine Safety & Health Act of 1977 |
| MSHA | Department of Labor's Mine Safety and Health Administration |
| OSH Act | Occupational Safety and Health Act |
| OSHRC | Occupational Safety and Health Review Commission |
| Secretary | Secretary of Labor |

# INTRODUCTION

The Federal Mine Safety & Health Act of 1977 ("Mine Act") divides its enforcement responsibilities between the Secretary of Labor ("Secretary") and the Federal Mine Safety and Health Review Commission ("FMSHRC" or "Commission"). The Secretary issues citations against mine operators, who can contest the merits of those citations in adjudicative proceedings before the Commission and its Administrative Law Judges ("ALJs"). To ensure that citation contests remain transparent even if they are settled, Section 110(k) of the Act provides that no contested penalty "shall be compromised, mitigated, or settled except with the approval of the Commission." 30 U.S.C. § 820(k).

In each of the consolidated proceedings below, the Secretary sought to settle citations contested before the Commission. The Secretary requested approval for the proposed settlement, but refused to provide any explanation for one element of that agreement: vacating one or more contested citations entirely, even as the mine operators agreed to accept others without further contest. The Secretary claimed that no explanation was needed for those vacaturs because they fall within her "unreviewable discretion." The Commission rejected that claim, explaining that the Secretary's agreement to vacate contested citations required approval because it "compromised, mitigated, or settled" the contested penalties.

For the reasons explained below, the Court should dismiss or deny the Secretary's petitions for review. At the outset, however, the Court can and should direct the Commission to participate in this appeal. Thus far, the Commission has declined to present any arguments, citing circuit precedent that excludes other independent adjudicative agencies from appearing as respondents. But that precedent is inapposite. It governs appeals of run-of-the-mill orders from such agencies, where they acted as a quasi-district court and held no direct stake in the appeal's outcome. Here, by contrast, the issue on appeal squarely implicates the Commission's own authority, and the central adversity is not between the Secretary and the mine operators (who fully support the Secretary's claims), but between the Secretary and the Commission. The Court should therefore direct the Commission to defend itself—as agencies without independent litigating authority regularly do— against the Secretary's challenge to its authority.

Regardless, this appeal should ultimately be dismissed for lack of jurisdiction. The Mine Act only permits the Secretary to appeal "final" Commission orders, and the orders below were not. The Secretary tries to evade that statutory bar by invoking the collateral order doctrine, which permits immediate interlocutory review for a narrow class of special nonfinal orders, like orders denying presidential or qualified immunity. But the Secretary fails to show that the orders below are "effectively unreviewable" in imperiling a cognizable public interest under the

doctrine. Her primary argument is that without immediate review, her interest in avoiding further proceedings before the Commission will be irretrievably lost. The Supreme Court has definitively rejected that "right to avoid trial" definition of "'effectively unreviewable'" as unworkably broad, instead requiring that delayed review also imperil a substantial public interest. *See Will v. Hallock*, 546 U.S. 345, 349-53 (2006) (citation omitted). The Secretary's gesture at the public interest in prosecutorial discretion fails. As courts have explained in the context of criminal prosecutions, there is no prosecutorial right to have a plea bargain accepted by the court. The same is true for the Secretary, whose prosecutorial discretion is not a right to settlement approval. There is accordingly no substantial public interest at issue here, and the doctrine's third condition is not satisfied. Just like rejected plea bargains, denied Mine Act settlements do not make the exclusive list of collateral orders.

If the Court does reach the merits, it should deny the Secretary's petitions. As Congress intended, the Mine Act sets boundaries on the Secretary's discretion to dispose of contested penalties. Specifically, Section 110(k) establishes a requirement of Commission approval that is triggered when a contested penalty is "compromised, mitigated, or settled." The Secretary does just that when, as part of a settlement agreement, she agrees to vacate some contested penalties in exchange for the mine operators agreeing to accept others. In fact, such contingent vacaturs

trip all three of Section 110(k)'s triggering verbs:  Through the vacatur, contested penalties are "compromised" by mutual concessions, "mitigated" in effect, and "settled" by the agreement that includes the vacaturs.  This understanding reflects the Commission's consistent interpretation of Section 110(k) as demanding review of the whole settlement—an interpretation Congress has declined to disturb even while amending related portions of the Mine Act.

The Secretary's theory is that under Section 110(k), the Commission cannot review any part of a settlement agreement except for reductions in dollar amounts of penalties.  That reading has no basis in the statutory text.  If Congress had meant to trigger the approval requirement only when a contested penalty is "reduced," it could easily have said so.  Instead, it used the much broader verbs of "compromised, mitigated, or settled."  The Secretary's theory would read those words out of the statute.  What is more, it would excuse her from explaining the full reasons for settling contested penalties—circumventing the oversight and accountability that Congress created the Commission to provide.

Rejecting the Secretary's claim will still leave her legitimate prosecutorial discretion intact.  All agree on her exclusive authority to initiate enforcement actions, as well as her prerogative to terminate them unconditionally in full.  And as Commission precedent requires, the Secretary's burden to obtain approval is light— requiring her to provide only a minimal showing of justification for contingent

vacaturs.  To the extent the Secretary objects to even that forgiving constraint, her complaint should be directed to Congress.  This Court should not dilute the Mine Act's clear commands.

The Court should accordingly (1) direct the Commission to participate in this case and (2) either dismiss or deny the petitions for review.

## STATEMENT OF JURISDICTION

The Secretary asserts that this Court has jurisdiction under the collateral order doctrine, and that adversity exists between her and the mine operators.  *See* Sec'y of Labor Br., Dkt. 2136309 (Sept. 22, 2025) ("OB").  *Amicus* argues that this Court lacks jurisdiction.  *Infra* Section II.

## ISSUES PRESENTED

1.  Whether this Court may direct the Commission to present arguments in this case.

2.  Whether this Court lacks jurisdiction.

3.  Whether the Secretary has unreviewable discretion to vacate a contested citation in a settlement agreement without the Commission's approval under Section 110(k) of the Mine Act, when the vacatur is contingent upon the resolution of other citations.

## STATUTES AND REGULATIONS

All applicable statutes are contained in the Opening Brief of the Secretary of Labor.

## STATEMENT OF THE CASE

### A.    The Mine Act's Split-Enforcement Scheme

Congress passed the Federal Mine Safety & Health Act of 1977 to address disastrous shortcomings in the enforcement of mine safety standards.  30 U.S.C. § 801 *et seq*.  The 1970s had brought "a frightening number of injuries and accidents," including "the death of 91 miners from carbon monoxide asphyxiation at the Sunshine Silver Mine in 1972, the death of 125 persons due to the bursting of an impoundment at the Buffalo Creek Mine in 1972, and the 1976 Scotia disaster in which twenty-three miners and three federal inspectors died in two explosions." Joint Appendix ("JA"), Dkt. 2136312, at 364 (Sept. 22, 2025).[1]  Congress found that such tragedies resulted, in part, because the existing "penalty system, as applied" was "insufficient to encourage mine management to comply with the law's requirements."  S. Rep. No. 95-181, at 42 (1977).

In particular, Congress was concerned that government enforcers were letting noncompliant mine operators off easy in settlement agreements for reasons that had

---

[1]    The two-volume Joint Appendix was filed in separate docket entries.  Dkt. 2136312; Dkt. 2136313.

nothing to do with mine worker safety—*e.g.*, "to save litigation and collection expenses." *Id.* at 44-45. Congress decided that even those ordinarily legitimate reasons for settling "should play no role" in the Mine Act context because they undercut the more important "purpose of encouraging operator compliance with the Act's requirements." *Id.* To make matters worse, the settlement negotiations were happening in secret, leaving Congress and the public in the dark about why and how the agreements were reached. *Id.* at 44-46. Congress resolved to prevent any potential "abuses" of such "off-the-record negotiations." *Id.* at 45.

Consequently, even as Congress delegated the Mine Act's primary enforcement power to the Secretary of Labor, it also created the Federal Mine Safety and Health Review Commission to check that power with a layer of accountability. Under the Act's split-enforcement scheme, the Secretary of Labor promulgates safety and health standards, conducts mine inspections, and issues citations to mine operators. 30 U.S.C. §§ 811, 813(a), 814(a). Citations are followed by a proposed penalty. 30 C.F.R. § 100.7(a).

The Act also establishes a procedure for mine operators to contest citations issued by the Secretary in an adversarial proceeding before the Commission. *Id.* § 815. The Commission appoints ALJs to initially adjudicate those contests. *Id.* § 823(d)(1). ALJ decisions may be appealed to the Commission, and Commission decisions may be appealed to this Court. *Id.* §§ 816(a)(1), 823(d)(2)(A)(i).

Congress did not stop at granting the Commission general adjudicatory authority over contested citations, however, because that would not address the problem of lax or opaque settlement agreements. "To remedy the situation," Congress limited the Secretary's prosecutorial discretion over settlement agreements—subjecting it to Commission approval. S. Rep. No. 95-181 at 45. Section 110(k) of the Mine Act provides: "No proposed penalty which has been contested before the Commission . . . shall be compromised, mitigated, or settled except with the approval of the Commission." 30 U.S.C. § 820(k). Since the Act's passage, the Commission has accordingly "review[ed] settlements entered into between the parties in contested penalty proceedings." *Amax Lead Co. of Mo.*, 4 FMSHRC 975, 977 (1982).

Section 110(k)'s constraint on the Secretary's prosecutorial discretion, while meaningful, is limited. It applies only after penalties are contested—before then, the Secretary can modify or vacate them in pre-assessment conferences with the cited operator. *See* 30 U.S.C. § 820(k); 30 C.F.R. § 100.6. It does not dictate when the Secretary must issue citations or which penalties she must propose. And it does not authorize the Commission to add or remove such sanctions itself. *See* JA356; JA362; *Mechanicsville Concrete, Inc. t/a Materials Delivery*, 18 FMSHRC 877, 879-80 (1996). Thus, "[u]nder the Act, the Secretary's charging discretion is as

uncabined as that of a United States Attorney under the Criminal Code." *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 157 (D.C. Cir. 2006).

In view of the Secretary's primary enforcement role, the Commission applies a highly deferential standard when deciding whether to approve settlements in contested penalty proceedings. As the Commission has explained: "If any relevant circumstances exist to plausibly suggest" a penalty should be compromised, mitigated, or settled, "all the Secretary needs to do is provide justification . . . in her settlement motion—and her motion must be granted." *Knight Hawk Coal, LLC*, 46 FMSHRC 563, 573 (2024) (collecting Commission precedent). Relevant circumstances include those related to the underlying statutory standards, such as the penalty factors set forth in Section 110(i), as well as those bearing on whether the settlement is "fair, reasonable, appropriate under the facts, and protects the public interest." JA358 (citing *Am. Coal Co*. (*AmCoal I*), 38 FMSHRC 1972, 1976 (2016)). The Commission must therefore "accord due consideration to the entirety of the proposed settlement package, including both its monetary and nonmonetary aspects." JA361 (quoting *Am. Coal Co*. (*AmCoal II*), 40 FMSHRC 983, 989 (2018). The Commission approves over 99.95 percent of proposed settlements. *AmCoal I*, 38 FMSHRC at 1977 n.7.

**B.     The Proceedings Below**

This appeal arises from eight contested citation proceedings that were consolidated into two Commission orders—one in *Crimson Oak Grove Resources LLC, et al.*, 46 FMSHRC 593 (2024), and the other in *County Line Stone Co., et al.*, 46 FMSHRC 924 (2024). *See* JA353-55; JA720-21.

In all material respects, these underlying proceedings share the same procedural history. Inspectors from the Department of Labor's Mine Safety and Health Administration ("MSHA") issued citations to the mine operators after finding health and safety violations. JA1-36; JA57-68; JA89-106; JA123-51; JA171-85 JA398-416; JA505-23. After the operators contested some of those citations, the Secretary and operators jointly sought ALJ approval of proposed settlement agreements. In each of those agreements, the operators agreed to accept certain citations without further contest, while the Secretary agreed to vacate one or more citations entirely. *See* JA353-55; JA720-21.[2] In considering those requests, the ALJ asked the Secretary to either "1) certify that the decision to vacate certain citations was not contingent upon the resolution of the remaining citations, or 2) explain how

---

[2]   In six of the proceedings, the Secretary filed a "Motion to Approve Settlement." JA37; JA69; JA152; JA417; JA476; JA524. In the other two, the request was styled as a "Motion to Dismiss." JA107; JA186. But absent any certification that the proposed vacatur was "coincidental and not contingent" upon a "*quid pro quo*" between the parties, the latter requests retained "the appearance of a settlement" and were construed as such by the ALJ. JA112; JA191.

the decision to vacate is an appropriate compromise, mitigation, or settlement pursuant to section 110(k) of the Mine Act." JA352; *see* JA720. The Secretary refused to do so, asserting that her decision to vacate contested citations was unreviewable and therefore required no explanation. *Id.*

When the ALJ denied the motions, the Secretary sought interlocutory review from the Commission. *Id.* The Commission consolidated the appeals into the *Crimson Oak Grove* and *County Line Stone* dockets, granting review of the ALJ's settlement denials and the overlapping legal question: "whether Section 110(k) of the Mine Act authorizes review of the Secretary's decision to vacate a citation in the context of a settlement, when the vacatur is contingent upon the resolution of other citations." JA203; JA655.

The Commission affirmed the settlement denials.[3] The Commission's reasoning on the question presented was straightforward: If the Secretary agreed to vacate certain citations in exchange for the operator accepting other ones, those agreements "compromised, mitigated, or settled" contested penalties and thus required approval under Section 110(k). JA360-61. As the Commission explained, that conclusion flowed directly from the plain meaning of Section 110(k)'s text. The

---

[3] The citations below are primarily from the *Crimson Oak Grove* Order, JA351-62, because the *County Line Stone* Order adopted the same reasoning, JA719-25. Commissioner Althen dissented from the *Crimson Oak Grove* Order, JA363-76, but did not participate in the *County Line Stone* Order, *see* JA719.

agreements "settled" all the contested penalties because, to resolve their dispute, the parties "mutually agreed to take actions against their own self-interest." JA360 & n.11 (citing *Settle*, *Black's Law Dictionary* (10th ed. 2014)). The vacaturs likewise "compromised" proposed penalties because they resolved the parties' "differences . . . by mutual concessions." JA361 n.13 (quoting *Compromise*, *Merriam-Webster.com* (last visited Dec. 17, 2024)). The vacaturs also reduced the overall payments owed by the operators and thus "mitigated"—"ma[d]e less severe or painful"—the penalties they accepted. JA361 (quoting *Mitigate*, *Merriam-Webster.com* (last visited Dec. 17, 2024)).

The Commission also explained why each of the Secretary's arguments failed. First, while agency decisions to settle are generally presumed unreviewable, Section 110(k) rebuts that presumption by subjecting the Secretary's settlement discretion to Commission approval in enumerated circumstances. JA357-58 (quoting *AmCoal I*, 38 FMSHRC at 1980 n.10); *see Heckler v. Chaney*, 470 U.S. 821, 828-35 (1985). Second, the Secretary's reliance on *Cuyahoga Valley Railway Co. v. United Transportation Union*, 474 U.S. 3, 7 (1985), and *RBK Construction, Inc.*, 15 FMSHRC 2099 (1993), was misplaced. *Cuyahoga Valley* held that the Secretary had unreviewable discretion to withdraw a citation under the Occupational Safety and Health Act, but that statute lacks any approval requirement similar to the Mine Act's Section 110(k). JA359 (citing 474 U.S. at 4-7). And while *RBK* recognized

the Secretary's authority to unconditionally "vacate all the citations at issue" in a contest proceeding, it said nothing about piecemeal vacaturs offered in a settlement agreement. *Id.* (citing 15 FMSHRC at 2101).

Finally, the Commission explained that the Secretary's cramped reading of Section 110(k) would defeat Congress's clear intent.

> If the Secretary was able to exchange vacatur for concessions from the operator without Commission oversight, there would be very little opportunity for miners, Congress, and other interested parties to assess the fairness and effectiveness of MSHA. It would be easy for the Secretary to hide arbitrary enforcement actions. Similarly, without Commission review, there would be no check on the Secretary's ability to vacate legitimate citations for unsafe conditions.

JA361. Those results render hollow both the "broad language of 110(k)" and the congressional findings that inspired it. *Id.*

The Commission therefore held that the ALJ correctly denied the Secretary's settlement proposals with unexplained vacaturs of contested citations. JA362; JA725. It remanded the cases back to the ALJ for further proceedings, and invited the parties "to resubmit motions to approve settlement before the Judge with additional information or different terms." JA725.

## C.    The Proceedings Before This Court

The Secretary petitioned for review of the Commission's orders, and the two sets of consolidated cases were further combined into a single docket before this Court. *See* Dkt. No. 2091892 (Dec. 30, 2024). The Commission filed a letter with

the Court stating that after "consultations with the Department of Justice and in consideration of this Court's ruling in *Oil, Chemical, and Atomic Workers Intern. Union v. OSHRC*, 671 F.2d 643 (D.C. Cir. 1982)," it did not intend to participate as an active litigant "unless otherwise directed by the Court."  Dkt. No. 2082815, at 1 (Oct. 30, 2024).  The Court issued an order directing the parties to show cause why the case should not be dismissed for lack of jurisdiction, and to address whether the Commission should be permitted or required to participate in the appeal.  Dkt. No. 2090378, at 2 (Dec. 19, 2024).

In response to the show-cause order, the Secretary argued that the Court retains jurisdiction and that the Commission's participation is not permitted.  Dkt. No. 2100084, at 2-15 (Feb. 11, 2025).  The mine operators filed short responses as well, noting their agreement with the Secretary.  Dkt. No. 2100870 (Feb. 14, 2025); Dkt. No. 2100905 (Feb. 14, 2025); Dkt. No. 2100937 (Feb. 14, 2025); Dkt. No. 2101046 (Feb. 18, 2025).  The Court discharged the show-cause order and instructed the parties to address in their merits briefs whether an Article III case or controversy exists and whether the collateral order doctrine permits this appeal.  Dkt. No. 2107448, at 2 (Mar. 24, 2025).

The Court appointed the undersigned as *amicus curiae* on August 6, 2025, with instructions "to present arguments in support of the Federal Mine Safety and Health Review Commission's orders, including but not limited to any arguments

that this court lacks jurisdiction over the petitions for review. In addition, amicus is directed to address whether this court may require the Commission to file briefs in these cases." Dkt. No. 2128941, at 1 (Aug. 6, 2025) (as amended by Dkt. No. 2141168 (Oct. 20, 2025)).

After the Secretary filed her merits brief, the mine operators filed a joint notice explaining that they had reviewed the Secretary's brief and "believe that the Secretary has fully addressed the issues before the Court and accordingly, join in the arguments presented therein." Dkt. No. 2141611, at 2 (Oct. 22, 2025).

## SUMMARY OF ARGUMENT

I. The Court may direct the Commission to participate in this appeal. Agencies—even those without independent litigating authority—routinely appear as respondents in appeals that challenge their authority. This Court's decisions in *Oil* and *Hinson* establish an exception. Those decisions excluded purely adjudicative independent agencies from participating in appeals where (1) they possess no adversity with the parties before them, nor any stake in the appeal's outcome, and (2) their absence would still leave adverse parties to litigate the appeal. While many appeals of the Commission's orders might fit that bill, this one does not. The Commission is adverse to the Secretary and has a direct stake in the appeal's disposition. Moreover, no adversity remains in this appeal without its participation.

The Court should accordingly decline to extend *Oil* and *Hinson* to this case and should direct the Commission to present its own arguments.

II.   The Court lacks jurisdiction over this premature appeal.   The Commission's orders below were undisputedly nonfinal, and do not qualify for the collateral order doctrine.   Just as other circuits do not permit collateral review when a proposed plea bargain is rejected, this Court should decline to review the denial of a proposed settlement agreement.   Delaying appeal will not imperil the kind of public interest that the doctrine recognizes as cognizable to render an order "effectively unreviewable."   The Court should therefore dismiss the Secretary's petitions for lack of jurisdiction.

III.  If the Court reaches the merits, it should uphold the Commission's orders. Section 110(k) of the Mine Act establishes judicially manageable standards, requiring the Secretary to obtain Commission approval before a contested penalty is "compromised, mitigated, or settled."   That approval is required here.   When the Secretary vacates a contested citation as part of a settlement agreement, the contested penalties in that agreement are (1) "compromised" by the mutual concessions of contingent vacaturs for accepted penalties; (2) "mitigated" in harshness because of the lessened enforcement consequences; and ultimately (3) "settled" by the agreement that includes vacaturs as part of the bargain.   This straightforward application of the text reflects decades of Commission practice, and Congress has

declined to disturb that practice even while amending other provisions—including those relating to the Commission's jurisdiction.

The Secretary's alternative reading—that Section 110(k) applies only to reductions in the dollar amounts of penalties—would erase the words "compromised, mitigated, or settled" from the statute and open an end run around the Act's oversight purposes. And her generalized appeals to prosecutorial discretion largely attack straw men. The Commission's highly deferential review of settlement proposals does not usurp the Secretary's enforcement prerogatives; it simply ensures her accountability, as Congress intended.

## ARGUMENT

## I. THE COURT MAY DIRECT THE COMMISSION TO PRESENT ARGUMENTS

*Amicus* submits that, in the specific circumstances of this case, the Court may direct the Commission to present arguments in support of its orders below.[4] The

---

[4] The Court instructed *amicus* "to address whether this court may require the Commission to file briefs in these cases." Dkt. No. 2128941, at 2. Typically, this Court "require[s]" parties to file briefs only in the sense that the failure to submit could result in forfeiture or default of some kind—not that some other sanction will follow. *Amicus* uses the word "direct" to convey that former meaning. Relatedly, the Commission's stated reason for not participating thus far is its understanding, after consultation with the Department of Justice, that it is prohibited from doing so by this Court's precedents. Dkt. No. 2082815, at 1. The Commission specifically contemplated participating if "otherwise directed by this Court." *Id.* If the Court were to clarify that those precedents do not apply in this case, it could then "direct" the Commission to reconsider its non-participation here.

Court has previously excluded independent adjudicative agencies like the Commission from participating in appeals of their orders. But the reasons the Court did so in those cases counsel the opposite result here. The Commission's participation is appropriate given its direct stake in the outcome of this case, which is tied to its unique statutory approval role in the enforcement process; its actual adversity with remaining parties; and the lack of adversity without its participation. While the Commission does not possess freestanding authority to initiate litigation, that does not preclude its appearance as a respondent to defend the scope of its statutory powers.

1. When an agency decision is appealed, the agency generally appears as a respondent to defend it. Twice before, however, this Court has determined that a purely adjudicatory agency could not participate as an active party in the judicial review of its decisions. In *Oil, Chemical, & Atomic Workers International Union v. OSHRC*, the OSHRC had dismissed a citation issued against the company American Cyanamid. 671 F.2d 643, 645-46 (D.C. Cir. 1982). A workers' union that had been party to the citation proceedings filed a petition for review, but named the Occupational Safety and Health Review Commission ("OSHRC") as a respondent rather than American Cyanamid. *Id.* at 646. This Court found error, concluding that OSHRC could not participate in the appeal. *Id.* at 651.

The Court gave several reasons for that conclusion. First, the OSHRC lacked "true adversity" with the parties before it—unlike disputes between "the claimant of a government benefit and the commission which seeks to withhold it," where the commission "is the party against whom relief is sought." *Id.* at 652. Second, because the OSHRC was established solely "to settle disputes between employers and the Secretary of Labor," it was "similar to a district court" in that "it has no stake in the outcome of the litigation" and so does not "appear and defend its decision upon direct appeal." *Id.* at 652-53. Finally, unlike a situation where "a single private party is contesting the action of an agency, and the agency must appear and defend to assure the adversarial stance requisite to a case or controversy," "sufficient adversity exists between the union and the company to insure proper litigation without the participation of the OSHRC." *Id.* at 653.

In *Hinson v. National Transportation Safety Board*, the Court relied on similar reasoning to exclude the National Transportation Safety Board from an appeal. 57 F.3d 1144 (D.C. Cir. 1995). As the Court explained, the Board lacked a "direct stake in the outcome" of its orders' appeal because its "adjudicatory function [was] roughly analogous to that of a district court." *Id.* at 1147 n.1. Further, the Board's governing statute did not appear to contemplate any adversarial role for the Board, and "there [was] sufficient adversity between the real parties in interest to ensure

proper litigation of all the issues." *Id.* As a result, the Court held that "the Board [was] not a proper party to [the] petition for review." *Id.*

In the Commission's capacity adjudicating run-of-the-mill citation disputes between the Secretary and mine operators, the same logic might apply. After all, that role "[r]eplicat[es] the division of responsibilities between the Secretary of Labor and the Occupational Safety and Health Review Commission." *Meredith v. FMSHRC*, 177 F.3d 1042, 1054 (D.C. Cir. 1999). But when it comes to the approval of settlements, the Mine Act divides responsibilities differently, giving the Commission an approval power that the OSHRC lacks. *See* 30 U.S.C. § 820(k). That difference explains why the issue on appeal here is not an ordinary dispute between the Secretary and mine operators. In fact, it is not a dispute between the Secretary and mine operators at all, who are in complete agreement. As a result, the Court need not address the Commission's potential exclusion from appeals of its more typical orders.

In the specific posture of this case, the key considerations from *Oil* and *Hinson* are flipped, and the analysis comes out the other way. To begin, there *is* "true adversity" between the Commission and a party before it. The Secretary claims authority to proceed with the proposed settlements, and "the commission . . . seeks to withhold it." *Oil*, 671 F.2d at 652. That is why the Commission "is the party against whom relief is sought" here, *id.*; the Secretary asks this Court to "instruct the

Commission" and its ALJs, going forward, either to examine the monetary reductions involved in those settlements, or to "grant the Secretary's motions" entirely, OB57. That remedy would curtail the Commission's longstanding construction of its approval obligation under Section 110(k), which encompasses both "monetary and nonmonetary aspects" of proposed settlement agreements. JA361 (quoting *AmCoal II*, 40 FMSHRC 983, 989 (2018)). The OSHRC in *Oil* and the Board in *Hinson* lacked any equivalent statutory mandate. And because this case concerns the scope of that mandate, the Commission—unlike the agencies in those cases—has a "direct stake in the outcome" here: its own authority under the Mine Act. *Hinson*, 57 F.3d at 1147 n.1; *see Oil*, 671 F.2d at 652. The Commission's position is therefore not "analogous to that of a district court." *Hinson*, 57 F.3d at 1147 n.1.

2. There is another problem with excluding the Commission: The remaining parties lack adversity. This Court has proceeded without adjudicative agencies only after assuring that doing so would "not trigger any jurisdictional problem potentially foreclosing the effective adjudication of the merits of the appeal." *Oil*, 671 F.2d at 652. *Oil* recognized that "the union and the company" could "be expected to litigate vigorously" over the OHSRC's order below. *Id.* at 653. *Hinson* likewise acknowledged the "sufficient adversity" between the Federal Aviation

Administration and the pilot whose certificate it suspended. 57 F.3d at 1145-46, 1147 n.1.

Here, excluding the Commission raises significant jurisdictional concerns. "Article III of the Constitution limits '[t]he judicial power of the United States' to 'cases' or 'controversies,' ensuring that federal courts act only 'as a necessity in the determination of real, earnest and vital' disputes." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (alteration in original) (citation omitted). "To establish a case or controversy, the parties must have adverse interests, meaning that a judgment benefiting the plaintiff's concrete interests must adversely affect a concrete interest of the defendant." *Cortes v. Nat'l Lab. Rels. Bd.*, 145 F.4th 57, 61 (D.C. Cir. 2025). In turn, an "honest and actual antagonistic assertion of rights," *United States v. Johnson*, 319 U.S. 302, 305 (1943) (citation omitted), generates "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends," *Baker v. Carr*, 369 U.S. 186, 204 (1962).

The only parties participating in this appeal—the Secretary and the mine operators—are not adverse. For starters, their legal positions are identical. After the Secretary filed her merits brief, the operators specifically declined to file a supplemental brief because they saw "no need" to further address the issues, opting instead to simply "join in the Arguments presented by the Secretary." Notice to

Adopt Secretary's Br. 2, Dkt. 2141611 (Oct. 22, 2025). Their complete accord is the opposite of an "antagonistic assertion of rights," *Johnson*, 319 U.S. at 305, or "adverse[] . . . presentation of issues," *Baker*, 369 U.S. at 204.

More fundamentally, the Secretary and the operators seek the exact same result in this appeal. The problem is not that they have agreed to settle their underlying disputes; if such agreement alone defeated jurisdiction, then a settlement could never be court-approved, which defies "common sense." OB34-35 (quoting *Cobell v. Salazar*, No. 11-5270, 2012 WL 1884702, at *1 (D.C. Cir. May 22, 2012)). The real problem is that, with respect to the sole question on appeal—may the Commission review contingent vacaturs in settlements?—both the Secretary and the operators' interests in consummating their settlement will rise or fall together. Because the parties do not "seek adverse forms of relief," this Court could not enter "a judgment that adversely affects one party's concrete interests and benefits the other's." *Cortes*, 145 F.4th at 62-63. The Secretary and the mine operators thus lack "adverse interests" in this appeal. *Id.* at 61.

3. The Secretary insists that there are no adversity problems here because "the Secretary has issued citations," while "the operators have contested them and have not withdrawn their contests." OB35. That may accurately describe the contest between the Secretary and operators before the Commission, but it elides the true nature of this appeal. Here, the Secretary and the operators are for all practical

23

purposes acting as "a single private party . . . contesting the action of an agency." *Oil*, 671 F.2d at 653. In this posture, "the agency must appear and defend to assure the adversarial stance requisite to a case or controversy." *Id.* It is particularly troubling, then, that the Secretary has also argued that the Commission should be excluded from participation here. *See* Dkt. No. 2100084, at 11-15. On the one hand, the Secretary urges this Court to proceed to the merits of a question on which she and the mine operators are completely aligned. On the other, she urges the Court to exclude the one party with an adverse interest in that question—the Commission itself. The Secretary cannot have it both ways.

The Secretary also cites a pair of OSHRC cases that she claims support finding adversity here. OB35 (citing *Brennan v. OSHRC*, 505 F.2d 869 (10th Cir. 1974); *Brennan v. OSHRC*, 502 F.2d 946 (3d Cir. 1974)). In reality, they do the opposite. The Secretary correctly observes that the courts proceeded to review OSHRC decisions without participation from the cited employer. *Id.* But the reason that posed no adversity problem was that the OSHRC *itself* participated in the appeal. (These cases predated the decisions holding that OSHRC is an improper respondent. *Supra* Section I.) Thus, while "the employer . . . filed no response to the Secretary's petition for review," the OSHRC "ha[d], however, responded in defense of its order." *Brennan*, 502 F.2d at 948; *see Brennan*, 505 F.2d at 870-71. Here, by

contrast, neither the Commission nor the mine operators offer any opposition to the Secretary's petition.

4.  In these circumstances, the appointment of *amicus* to argue in support of the Commission's orders is an imperfect cure to the lack of adversity.  To be sure, the Supreme Court sometimes appoints *amici* to supply missing adversarial arguments—typically, when the government declines to defend a federal law or changes positions mid-litigation—but only after confirming that Article III is satisfied and that prudential considerations weigh in favor of retaining jurisdiction. *See United States v. Windsor*, 570 U.S. 744, 755-63 (2013); *see, e.g.*, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212-13 (2020).

As in those typical cases, the Secretary and operators do "retain[] a stake" in the appeal necessary for standing.  *Windsor*, 570 U.S. at 757.  But unlike in those cases, the parties' stakes here rise and fall together.  *See id.* at 758.  The Secretary and operators lack any "adverse interests" in the appeal's disposition permitting "a judgment that adversely affects one party's concrete interests and benefits the other's." *Cortes*, 145 F.4th at 61, 63.  It is not clear, therefore, that their participation alone sustains a case or controversy.  *See Nat'l Lab. Rels. Bd. v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 401-04 (4th Cir. 2022).

Prudential considerations also weigh against proceeding without the Commission here.  *Amicus* cannot replace the Commission's expertise, nor exercise

the procedural options that a full party can—including filing an appeal, which is irrelevant in typical Supreme Court appointments, but vital in the lower courts. *See Moten v. Bricklayers, Masons & Plasterers Int'l Union*, 543 F.2d 224, 227 (D.C. Cir.1976) (per curiam) (*amici* may not appeal judgments). As a result, the better solution to the "jurisdictional problem" here, *Oil*, 671 F.2d at 652, is to direct the Commission itself to participate.

5. Lastly, the Commission's lack of independent litigating authority does not categorically disqualify it from participating here. *Contra* Secretary's Amended Resp. to Show-Cause Order, Dkt. No. 2100084, at 11-15 (Feb. 11, 2025). It is true that the Mine Act grants only the Secretary power to initiate litigation. *Id*.; *see* 30 U.S.C. § 822. But it does not follow that the Commission cannot appear to defend its own authority. Many other agencies without independent litigating authority— for instance, the Department of Education, *see* 20 U.S.C. § 3412; or the Department of Agriculture, *see* 7 U.S.C. § 2204—routinely appear in court to defend themselves from challenges.[5] Indeed, if the absence of independent litigating authority

---

[5] Generally, agencies in such cases are represented by attorneys from the Department of Justice, reflecting the default rule of 28 U.S.C. § 516. However, there is some precedent for agencies being represented by their own internal counsel. *See Duval Corp. v. Donovan*, 650 F.2d 1051, 1053 n.1 (9th Cir. 1981) (explaining that while "the Secretary of Labor is represented by the Solicitor of Labor," the Commission also "has its own counsel" who is "entitled to appear before this court" and whose presentation "would be helpful to the court and to the parties"); *see also*

dispositively precluded an agency from appearing in a defensive posture, then *Oil* and *Hinson* could have rested solely on that ground. Instead, this Court undertook the analysis discussed above, confirming the relevance of other considerations.

In sum, each of the reasons this Court gave for *excluding* the agency respondents in *Oil* and *Hinson* are reasons for *including* the Commission in this case. Even if those precedents govern ordinary appeals of Commission orders, the special posture of this appeal is different. The Court may direct the Commission to participate here.

## II. THE COURT LACKS JURISDICTION OVER THIS APPEAL

This premature appeal should be dismissed for lack of jurisdiction. All agree that the Mine Act authorizes judicial review only of a "final order" of the Commission, 30 U.S.C. § 816(b), and that the orders denying settlement approval here do not fall within that meaning, *see* OB27 n.5. The Secretary nonetheless urges this Court to hold, for the first time, that such orders are reviewable under the collateral order doctrine. But in attempting to satisfy the doctrine's third condition—that an order would be "effectively unreviewable" on appeal from final judgment—the Secretary advances a theory that the Supreme Court has squarely rejected: That

---

*United States v. FCC*, 652 F.2d 72, 74 (D.C. Cir. 1980) (FCC represented by its internal counsel in defending challenge brought by the Department of Justice, among others). *Amicus* takes no position on which counsel should represent the Commission here.

delayed review will irretrievably deny her right to avoid further proceedings before the Commission. Her attempt to portray delay as a cognizable deprivation of prosecutorial discretion does not rescue her theory. As shown by cases declining collateral review for denials of plea bargains, prosecutorial discretion does not include a right to approval of a negotiated disposition. The Court therefore should adhere to the Mine Act's finality requirement and decline to exercise jurisdiction here.

1. The collateral order doctrine operates against the foundational principle "that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of . . . error at any stage of the litigation may be ventilated." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). That principle reflects "substantial finality interests," like "judicial efficiency" and "avoid[ing] the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals." *Will v. Hallock*, 546 U.S. 345, 349-50 (2006) (alteration in original) (citation omitted).

Accordingly, the Supreme Court has "repeatedly stressed that the 'narrow' exception" occupied by the collateral order doctrine "should stay that way and never be allowed to swallow the general rule." *Digital Equip.*, 511 U.S. at 868. To qualify, an order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be

effectively unreviewable on appeal from a final judgment." *Will*, 546 U.S. at 349 (citation omitted). These conditions must be particularly "stringent" because "the issue of appealability" under the doctrine "is to be determined for the entire category to which a claim belongs." *Digital Equip.*, 511 U.S. at 868. "[A]lthough the Court has been asked many times to expand the 'small class' of collaterally appealable orders," it has "instead kept it narrow and selective in its membership." *Will*, 546 U.S. at 350. That small class includes, for example, orders denying the defenses of absolute immunity, *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982), qualified immunity, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); and double jeopardy, *Abney v. United States*, 431 U.S. 651, 659-60 (1977).

2. In recent decades, the Supreme Court has narrowed the third condition for collateral orders, clarifying that only certain kinds of "'irretrievabl[e] los[s]'" render an order "effectively unreviewable on appeal from final judgment." *Digital Equip.*, 511 U.S. at 867, 879 (alterations in original) (citation omitted). Cognizable losses do not include "'every right that could be enforced appropriately by pretrial dismissal,'" even if they could be described as "a right to avoid trial," *Will*, 546 U.S. at 350-51 (citation omitted), or might be "imperfectly reparable by appellate reversal" of a final judgment, *Digital Equip.*, 511 U.S. at 872.

That is because "virtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a 'right not to stand

trial,'" and thus qualify as "'effectively unreviewable' in the sense that relief from error can never extend to rewriting history." *Digital Equip.*, 511 U.S. at 872-73 (citation omitted); *see Will*, 546 U.S. at 350 (collecting examples). That would leave the finality requirement "in tatters." *Will*, 546 U.S. at 351.

Instead, the "the decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009) (quoting *Will*, 546 U.S. at 352-53). Thus, "it is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts." *Will*, 546 U.S. at 353.

3. The doctrine's application in an analogous context—denials of plea bargains requiring court approval—is instructive. In criminal prosecutions, such plea bargains are the equivalent of the settlement proposals at issue in this case. As here, they arise in the context of the government prosecuting charges against a defendant. They conclusively resolve those charges through a "bargained-for exchange" of "concessions" from "each side." *Ricketts v. Adamson*, 483 U.S. 1, 9 n.5 (1987) (citation omitted). And they are subject to approval from the district court. Fed. R. Crim. P. 11. When asked to review the rejection of plea bargains as collateral orders, however, the two circuits to consider the issue have refused to do

so.  *United States v. Samueli*, 582 F.3d 988 (9th Cir. 2009); *United States v. Carrigan*, 778 F.2d 1454 (10th Cir. 1985).[6]

Those courts' reasoning is particularly instructive with respect to the kinds of irretrievable losses that are cognizable—or not—under the third collateral order condition.  In *Carrigan*, the government claimed that the Constitution required immediate correction of the "district court's unwarranted interference in the exercise of executive discretion."  778 F.2d at 1465.  The Tenth Circuit disagreed because, unlike a prosecutor's right to dismiss charges wholesale, there was no "Government[] right to have a plea bargain accepted" by the district court.  *Id.*  Moreover, an "order denying a proposed plea bargain does not conclusively force the Government to trial."  *Id.* at 1466.  *Samueli*, expressly following *Carrigan*, added that after a final sentencing order was in place, "either party may argue that the district court abused its discretion in rejecting the combined plea and sentence

---

[6]  Certain civil settlements also require court approval.  In those contexts, a similar consensus holds that denying or rescinding approval for a settlement agreement is not a collateral order.  *See Digital Equip.*, 511 U.S. at 865-68 (denying collateral review for rescission of approval for settlement agreement); *McClendon v. City of Albuquerque*, 630 F.3d 1288 (10th Cir. 2011) (denying collateral review for withdrawal of approval for settlement agreement); *Utah ex rel. Utah State Dep't of Health v. Kennecott Corp.*, 14 F.3d 1489 (10th Cir. 1994) (denying collateral review for denial of settlement including a consent decree under the Comprehensive Environmental Response, Compensation, and Liability Act); *Seigal v. Merrick*, 590 F.2d 35 (2d Cir. 1978) (denying collateral review for denial of settlement in shareholder derivative case).

agreement." 582 F.3d at 992. As a result, both circuits concluded that the government's asserted right to avoid trial through a plea bargain was not a cognizable loss rendering the plea bargain rejections "effectively unreviewable."

4. For similar reasons, the settlement denials at issue here do not cause the kinds of irretrievable losses necessary to qualify as "effectively unreviewable" and satisfy the collateral order doctrine's third condition. The Secretary is right that "[o]nce administrative proceedings have run their course, the interest in avoiding them has been vitiated and cannot be vindicated." OB31 (quoting *Meredith*, 177 F.3d at 1052). But that fact alone "has never sufficed to meet the third [condition]." *Digital Equip.*, 511 U.S. at 872. If it did, then "Congress's final decision rule would end up a pretty puny one," with immediate review granted to "virtually every right that could be enforced appropriately by pretrial dismissal." *Id.* at 872-73 (collecting examples). That is why "it is not mere avoidance of a trial, but *avoidance of a trial that would imperil a substantial public interest*, that counts." *Will*, 546 U.S. at 353 (emphasis added).

The Secretary has identified no "substantial public interest" imperiled by the continuation of administrative proceedings before the Commission. She suggests that her "prosecutorial discretion" would be lost if judicial review were delayed here, implying an injury to the constitutional separation of powers. OB32. Not so. As the Tenth Circuit explained with respect to criminal prosecutions, that prosecutorial

discretion includes the right "to dismiss all the charges against the parties to the agreement in an unconditional . . . motion," or to "exercise the option of simply declining to prosecute further." *Carrigan*, 778 F.2d at 1466. But those actions are distinct from consummating an agreement that resolves pending charges through a "bargained-for exchange" of "concessions" from "each side." *Ricketts*, 483 U.S. at 9 n.5 (citation omitted). Unlike the Executive's prerogative to completely dismiss or decline a prosecution, there is no "right to have a plea bargain accepted." *Carrigan*, 778 F.2d at 1465. That is true even in the unusual situation where the government "join[s] a defendant on appeal in arguing that no trial should have been held." *Id.* at 1465-66. Consequently, for purposes of the third condition, there is no "substantial public interest" in government prosecutors avoiding a trial by entering a plea bargain.

What is true of plea bargains is true here. *Cf. Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 157 (D.C. Cir. 2006) (comparing the Secretary's enforcement discretion to a U.S. Attorney's). The Secretary's exclusive authority includes the discretion to issue citations against mine operators in the first place, as well as to unconditionally dismiss them. *See Mechanicsville Concrete, Inc. t/a Materials Delivery*, 18 FMSHRC 877, 879-80 (1996); *RBK Constr., Inc.*, 15 FMSHRC 2099, 2100-01 (1993). If the Commission had tried to prevent one of those actions, that could impinge on the Secretary's prosecutorial discretion, and "an

appeal might lie." *Carrigan*, 778 F.2d at 1466. But an order denying a proposed settlement "does not present the same constitutional difficulties." *Id.* at 1465. The Secretary has no right to have a settlement accepted. Reviewing her claims now is therefore not necessary to "avoid[] . . . a trial that would imperil a substantial public interest." *Will*, 546 U.S. at 353. Just like the denial of a plea bargain, then, the denial of a settlement proposal does not subject the Secretary to "effectively unreviewable" losses for collateral order purposes. *Digital Equip.*, 511 U.S. at 872.

5. Holding otherwise would contravene Congress's clear intent, undermine important values, and disrupt the consensus in analogous contexts. The Mine Act states that only a "final order of the Commission" is subject to judicial review. 30 U.S.C. § 816(b). The finality requirement reflects Congress's judgment that "piecemeal appeals" frustrate the "efficient administration of justice." *Digital Equip.*, 511 U.S. at 867-68, 872. Opening the courthouse doors to months or years of interlocutory litigation anytime the Commission denies a proposed settlement would contradict both the Mine Act and its purposes. It would also call into question the settled understanding that the collateral order doctrine does not apply to orders denying approval for plea bargains or other civil settlements that must be accepted by the district court. The Court can avoid that disarray by hewing to the Mine Act's rule: Judicial review is reserved for a "final order" of the Commission. 30 U.S.C. § 816.

The cases cited in the Secretary's analysis of the third condition are neither controlling nor persuasive. *See* OB31-33. Most of them are decades-old, out-of-circuit decisions permitting interlocutory appeals from OSHRC decisions which have nothing to do with settlement denials. *See id.* The two that reviewed settlement denials did so on the basis of (1) the Secretary's exclusive authority over settlements under the Occupational Safety and Health Act ("OSH Act"); and (2) the notion that delayed review "will never fully vindicate the Secretary's position that he could have settled the case" because he will bear the costs of litigating the case to final judgment. *Marshall v. Oil, Chem. & Atomic Workers Int'l Union*, 647 F.2d 383, 387 (3d Cir. 1981); *see also Donovan v. Occupational Safety & Health Rev. Comm'n*, 713 F.2d 918, 923-24 (2d Cir. 1983). The first basis only underscores the OSH Act's contrast with the Mine Act, which distinctly shares the Secretary's authority over settlements with the Commission. And the second basis has since been expressly and repeatedly repudiated by the Supreme Court as insufficient to justify collateral review. *See Will*, 546 U.S. at 350-53; *Digital Equip.*, 511 U.S. at 869-75. The OSHRC cases are not good law, especially in the Mine Act context.

The Secretary's only other authority is *Secretary of Labor, Mine Safety & Health Administration v. Industrial TurnAround Corp.*, a case that *rejected* the Secretary's bid for collateral review based on those same OSHRC cases. 138 F.4th 1339 (D.C. Cir. 2025). There, this Court cited the OSHRC cases to "merely

highlight[] the relative unimportance of the order" at issue—*i.e.*, to explain why the order failed the second collateral order condition of "'resolv[ing] an important issue completely separate from the merits of the action.'" *Id.* at 1343-44 (citation omitted). The Court did "not decide whether the other [collateral order] requirements are met." *Id.* at 1343 (citation omitted). As a result, its drive-by distinction of the OSHRC cases has no bearing on whether the third condition is satisfied here.

Finally, the Court should feel "no dismay" at "preserving the strict limitations on" collateral review, "for the law is not without its safety valve to deal with cases . . . out of the ordinary run." *Digital Equip.*, 511 U.S. at 883. In truly "extraordinary circumstances"—a "'usurpation of power,'" "'a clear abuse of discretion,'" or some other "manifest injustice"—"a party may petition the court of appeals for a writ of mandamus." *Mohawk*, 558 U.S. at 111 (citation omitted). "That a fraction of orders" denying approval for settlements "may nevertheless harm individual litigants in ways that are 'only imperfectly reparable' does not justify making all such orders immediately appealable as of right." *Id.* at 112 (quoting *Digital Equip.*, 511 U.S. at 872).

The Secretary would elevate this case to the ranks of *Nixon*, *Mitchell*, and *Abney*. And not just this case, but "the entire category to which a claim belongs"— all settlement denials. *Digital Equip.*, 511 U.S. at 868. Setting precedent at that

"high[] level of generality," as is required, *id.* at 876-77, would flood this Court with untold new appeals, disrupt the District Court's docket management, and burden litigants with additional rounds of appellate review. There is no good reason to take that course. The doctrine's "narrow" application "should stay that way." *Id*. at 868.

## III. THE COURT SHOULD UPHOLD THE COMMISSION'S DECISIONS

If the Court reaches the merits, it should deny the Secretary's petitions for review. The Mine Act's Section 110(k) expressly limits the Secretary's prosecutorial discretion, and the limit is judicially manageable: The Secretary may not compromise, mitigate, or settle a contested penalty without Commission approval. As the Commission correctly held, that approval requirement clearly applies to the conditional vacatur of citations in a settlement agreement for contested penalties. The Secretary's attempt to rewrite Section 110(k) as limiting Commission review to penalty reductions, along with her generalized invocations of prosecutorial discretion, are unavailing.

### A. The Mine Act Places Judicially Manageable Limits On The Secretary's Discretion

Unlike most agency actions, traditional exercises of prosecutorial discretion are presumed unreviewable. *See Heckler v. Chaney*, 470 U.S. 821, 828-29 (1985). But as "[t]he Secretary has acknowledged" previously, "'the *Chaney* presumption of unreviewability is rebutted by the existence of [s]ection 110(k).'" *AmCoal I*, 38 FMSHRC 1972, 1980 n.10 (2016) (alteration in original) (citation omitted). Section

110(k) sets judicially manageable boundaries on the Secretary's discretion to dispose of contested penalties.

## 1. Congress May Constrain An Agency's Prosecutorial Discretion

Agency actions are generally subject to judicial review. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,* 586 U.S. 9, 23 (2018). There is an exception, however, for the "very narrow" class of agency actions "committed to agency discretion by law." *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000) (citation omitted). The exception is limited to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser*, 586 U.S. at 23.

Traditional exercises of prosecutorial discretion—including decisions to initiate and halt enforcement actions—generally constitute one such exception. *See Heckler*, 470 U.S. at 828-29. But the exception does not apply where a statute indicates "an intent to circumscribe agency enforcement discretion" and provides "meaningful standards for defining the limits of that discretion." *Id.* at 834-35. In those circumstances, "there is 'law to apply,'" and "courts may require that the agency follow that law." *Id.*

In determining whether to review an agency's exercise of prosecutorial discretion, courts look to "the particular language and overall structure of the statute in question, as well as 'the nature of the administrative action at issue.'" *Speed*

*Mining, Inc. v. FMSHRC*, 528 F.3d 310, 317 (4th Cir. 2008) (citation omitted) (quoting *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)). For example, the Supreme Court recognized in *Heckler* that a statute requiring prosecution when "certain 'clearly defined factors' were present" fell within "'the judicial capacity to supervise.'" 470 U.S. at 834 (citation omitted) (citing *Dunlop v. Bachowski*, 421 U.S. 560, 567 n.7 (1975)). "Meaningful standards" may be derived not only from statutory text, but also from the agency's own binding guidance and regulations. *See Twentymile Coal Co.*, 456 F.3d at 158-59; *Block v. SEC*, 50 F.3d 1078, 1082 (D.C. Cir. 1995).

### 2. The Mine Act Limits The Secretary's Discretion To Compromise, Mitigate, Or Settle Contested Penalties

The Mine Act unambiguously limits the Secretary's prosecutorial discretion. The "best evidence of Congress's intent is the statutory text," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012), and here the text is clear. Section 110(k) states: "No proposed penalty which has been contested before the Commission . . . shall be compromised, mitigated, or settled except with the approval of the Commission." 30 U.S.C. § 820(k). The provision has three parts. The first part defines its subject: contested penalties. The second part defines its trigger: when those penalties are "compromised, mitigated, or settled." And the third part defines its consequence: Commission approval is required. Taken together: Once a penalty

is contested, the Secretary needs Commission approval to compromise, mitigate, or settle it.

Section 110(k)'s clearly defined subject, trigger, and consequence provide "meaningful standards for defining the limits" on the Secretary's discretion. *Heckler*, 470 U.S. at 834. *Contra* OB47-49. The text draws a sharp line marking where the Secretary loses absolute discretion over "the manner in which the [agency] is to proceed against a particular transgressor." *Baltimore Gas & Elec. Co. v. FERC,* 252 F.3d 456, 461 (D.C. Cir. 2001). Once penalties have been contested, the Secretary can no longer unilaterally compromise, mitigate, or settle them; to proceed with any of those actions, she must first obtain Commission approval. 30 U.S.C. § 820(k). Courts can readily assess when the conditions requiring approval have been met, and the Secretary has never suggested otherwise—nor could she. This Court has found and applied "'meaningful standard[s]'" in far more "permissive and indeterminate language" than Section 110(k). *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (citation omitted); *see, e.g.*, *id.* (finding meaningful standard in statute requiring only "high quality and cost-effective" care (quoting 24 U.S.C. § 413(b)); *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1399 (D.C. Cir. 1995) (finding meaningful standard where agency could excuse a failure to file "if it finds it to be in the interest of justice" (quoting 10 U.S.C. § 1552(b))).

Once faced with the Secretary's request to compromise, mitigate, or settle a contested penalty, the Commission scrutinizes the proposal no more than necessary to ensure the Act's integrity. Under its own binding precedent, the Commission's review is highly deferential to the Secretary. *See Sec'y of Labor, Mine Safety & Health Admin. v. Consolidation Coal Co.*, 895 F.3d 113, 119 (D.C. Cir. 2018) (holding the Commission bound by its precedent). The general inquiry is whether the proposed settlement is "fair, reasonable, appropriate under the facts, and protect[ive of] the public interest." *AmCoal I*, 38 FMSHRC at 1982. In practice, the demands of that inquiry are minimal: "If any relevant circumstances exist to plausibly suggest" a penalty should be compromised, mitigated, or settled, "all the Secretary needs to do is provide justification . . . in her settlement motion—and her motion must be granted." *Knight Hawk Coal, LLC*, 46 FMSHRC 563, 573 (2024) (collecting Commission precedent). The Commission assesses what "circumstances" might be "relevant" by looking to the Mine Act's underlying standards, such as the penalty assessment factors section forth in Section 110(i). *Id.* at 566-71; *see* 30 U.S.C. § 820(i). So long as the Secretary provides some factual basis for each compromise, mitigation, or settlement, she can dispose of the contested penalties as she sees fit.

In sum, the Mine Act's Section 110(k) expressly articulates where the Secretary's unfettered prosecutorial discretion ends, and it does so in terms that this

Court can identify and supervise.  As the next section explains, this case illustrates how straightforwardly the Act's limits can be applied.

**B.      Agreements to Vacate Contested Penalties Fall Squarely Within Section 110(k)**

Section 110(k) requires the Secretary to obtain Commission approval before vacating contested citations when that vacatur is contingent upon mine operators accepting other citations.  That conclusion flows from the "natural meaning" of the statutory text.  *Smith v. United States*, 508 U.S. 223, 228-29 (1993).  Section 110(k)'s triggers are trebly satisfied here:   Contested penalties are "compromised," "mitigated," *and* "settled" when a proposed settlement agreement includes vacatur of some contested citations in exchange for the acceptance of others.  That plain meaning also reflects the Commission's longstanding practice of considering the monetary *and* nonmonetary aspects of settlement proposals, a practice that Congress has left undisturbed even as it has amended related parts of the Act.  Congress's approval is unsurprising, since the plain meaning of Section 110(k) also vindicates the Mine Act's health and safety objectives.

Start with Section 110(k)'s three triggering verbs, all three of which are tripped in this case.  First, contingent vacaturs "compromise" contested penalties.  "Compromise" means to "adjust or settle by mutual concessions."  *Compromise*, *Merriam-Webster.com*, https://tinyurl.com/53fpr8cz (last visited Dec. 17, 2025).  When the Secretary and a mine operator agree to a proposed settlement, they resolve

the contested penalties through mutual concessions. On one side of the compromise, the operator agrees to accept a penalty; on the other, the Secretary agrees to vacate a citation.

Vacaturs also "mitigate" contested penalties. To "mitigate" is to "make less severe or intense; to make less harmful, unpleasant, or seriously bad." *Mitigate*, *Black's Law Dictionary* (12th ed. 2024). In addition to eliminating the penalty associated with the vacated citation, vacatur softens the blow of the other citations in a penalty package. As the Commission noted, "the vacatur of a citation in a proposed settlement will result in a change in penalty amounts and affect the operator's agreement to pay." JA362. When one citation is vacated, it has a mitigating effect on the "entirety of the proposed settlement package," including the contested penalties that remain. *AmCoal II*, 40 FMSHRC at 989 (citation omitted). Those remaining penalties affect the operator less severely.

Finally, agreements to vacate "settle" contested penalties. To "settle" is to "adjust differences; to come to a good understanding;" or to "resolve" a "disagreement." *Settle*, *Black's Law Dictionary*, *supra*. Each settlement agreement proposed by the Secretary and Respondents reflects an attempt to resolve disagreements, both about individual penalties and about the citation package as a whole. And those disagreements are resolved in part, or even in whole, through vacaturs. Take the settlement agreement proposed by the Secretary and respondent

Greenbrier Minerals, LLC. JA69-72. There, the *only* change proposed in the parties' motion to approve settlement was that two of the six citations would be vacated. JA70. The parties did not propose any changes to the other four penalties, nor explain why the operator had agreed to pay them in full. *Id.* The settlement was achieved solely through vacatur. In this and other settlement proposals, vacaturs were also the sole source of penalty reductions. *See* JA70; JA107; JA186; JA417-18. Under Section 110(k), the vacaturs therefore require Commission approval.

Reflecting the plain meaning of Section 110(k), the Commission has repeatedly affirmed that its review extends holistically to both "*monetary and nonmonetary aspects*" of settlement proposals, including vacaturs. *AmCoal II*, 40 FMSHRC at 989 (citation omitted); *see PC Sand & Gravel*, 32 FMSHRC 235, 236 (2010) (approving a settlement after the Secretary "proffer[ed] legitimate reasons for vacating . . . citations"); *Hickory Coal Co.*, 14 FMSHRC 1160, 1161 (1992) (approving a settlement after considering "nonmonetary aspects of the settlement," including a requirement that operator inform MSHA before reopening); *Rulon Harper Constr., Inc.*, 44 FMSHRC 671, 679 (2022) (denying a motion to approve settlement where the Secretary proposed "stripping citations of their [significant and substantial] and unwarrantable failure designations" without sufficient explanation).

In the decades since enacting the Mine Act, Congress has declined to alter this consistent construction of Section 110(k). "When Congress revisits a statute giving

rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 801 n.16 (D.C. Cir. 2023*) (quoting *CFTC v. Schor*, 478 U.S. 833, 846 (1986)), *cert. denied*, 144 S. Ct. 1110 (2024). That happened here. In 2006, Congress subjected the Mine Act to a thorough review and amendment process to raise penalties, increase enforcement, and promote compliance. S. Rep. No. 109-365, at 1-2 (2006). The amendments made additions to Section 110, expanded the Commission's review jurisdiction, and made other extensive changes. *Id*. at 5, 16. But Congress left Section 110(k) undisturbed. *Id.* at 5. That is "persuasive evidence" Congress agrees with the Commission's approach under that section. *Am. Forest Res. Council*, 77 F.4th at 801 n.16.

Congress's acquiescence is no surprise. The Commission's reading of Section 110(k) is consistent with the Act's broader health and safety objectives, as well as with the specific legislative intent to ensure transparency and accountability in the settlement process. JA356-57 (citing S. Rep. No. 95-181, at 44-45 (1977)). As Congress intended, the Secretary needs Commission approval to compromise, mitigate, or settle a contested penalty.

## C. The Secretary's Contrary Arguments Fail

The Secretary asserts that the contingent vacaturs in the proposed settlements below are unreviewable for two overarching reasons. First, Section 110(k) requires the Commission's approval only for reductions in the dollar amount of a contested penalty. Second, the Commission's review would impermissibly impinge on her prosecutorial discretion. Neither assertion has merit.

### 1. Section 110(k) Covers More Than Just Penalty Reductions

The Secretary claims that "vacatur of a citation is not a penalty settlement," "a compromise[,] or a mitigation" because "its impact on the penalty is indirect." OB45. The only action she recognizes as requiring approval under Section 110(k) is reducing a penalty's dollar amount. The Secretary is wrong several times over.

As an initial matter, the Secretary is wrong that vacatur's impact on the penalty is only indirect. The premise of the Commission's decisions below is that the Secretary's proposed agreements "vacate[d] a citation in consideration of an operator's concessions." JA352. The vacatur was "integral to the settlement package"—a but-for cause that the operators agreed to pay other contested penalties. JA361. In a direct sense, therefore, the vacatur both "compromised" and "settled" those penalties. *Supra* Section III.B.

The Secretary resists that conclusion by claiming that "[t]here is no basis in the evidentiary record to support the Commission's presumption that any provision

46

of any settlement here is contingent upon any other provision in that settlement." OB52. That is not true. The ALJs below expressly found that the vacatur "appears to involve quid pro quo" for the operators' acceptance of other citations. JA243. The obvious basis for that inference was that the parties made those mutual concessions at the same time, in the same agreement, and without any alternative explanation. *Id.* Indeed, in *Greenbrier Minerals*, the Secretary's *only* proposed changes were vacaturs. JA70. Unless the Secretary's decision to vacate two penalties was completely coincidental and unrelated to the operator's simultaneous decision to accept four penalties, then, the concessions were a bargained-for exchange. *Id.* The Secretary was repeatedly invited to dispel that inference by simply "certifying that there has been no agreement involving an exchange of the vacations for accepting the other violations as written." JA243; *see* JA247; JA483. She repeatedly refused. The Secretary cannot now credibly challenge the ALJ's inferences for the first time on appeal, much less wave them aside as "meritless assumptions." OB51.

In any event, the Secretary is wrong that indirect impacts cannot trigger Section 110(k)'s approval requirements. She does not even try to identify a textual source for that claim, and there is none. In fact, the trigger verbs Congress chose convey the opposite meaning, as even simple examples confirm. Everyone understands that a car's cost can be indirectly "compromised" (as one side of mutual

concessions) or "mitigated" (made less harsh) by the dealer throwing a set of winter tires into the bargain rather than dropping the sticker price. So too here. As the Commission explained, the "broad language" of Section 110(k)'s trigger verbs "contemplates Commission review of arrangements between the Secretary and the operator that, by themselves, may not directly affect a civil penalty." JA361.

The Secretary's theory of what *can* trigger Section 110(k) is equally baseless. In her view, the only thing that counts is "an action to reduce" a penalty's dollar amount. OB45; *see* OB44 ("a penalty compromise" is to "reduce the penalty amount"). Put differently, the Secretary suggests that Congress used three broad verbs—"compromised, mitigated, or settled"—to describe the potential triggering effects on penalties when it really meant one narrow verb—"reduced." That reading violates the "basic interpretive canon[]" that statutes must be construed "so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (citation omitted). If Congress had meant that the Secretary only needed Commission approval for reducing monetary penalty amounts, it could easily have said so. But it did not. The Secretary cannot rewrite Section 110(k).

The Secretary's reading would also hamstring the Mine Act's purposes. The whole point of Section 110(k) is to prevent "abuses" associated with "off-the-record negotiations"—specifically, settlements that excused safety violations for reasons

unrelated to protecting mine workers, such as "to save litigation and collection expenses." S. Rep. No. 95-181 at 44-45. The "remedy" for that concern was requiring the Secretary to provide a public accounting of the reasons for settlement through the Commission review and approval process. *Id.* at 45. If all the Commission could review were penalty reductions, that accountability could be easily evaded.

Imagine, for example, that the Secretary wants to settle a contest before the Commission to save resources, but knows she could not justify reducing penalty amounts to an ALJ. So, she offers the mine operator something else they want instead, like vacating other citations, even though the vacaturs are not justified under the statute either. Under the Secretary's reading of Section 110(k), the Commission could never review that sleight of hand. Over time, this lax and unaccountable enforcement could prove "insufficient to encourage mine management to comply with the law's requirements." *Id.* at 42. And mine workers would eventually pay the price. *Id.* Congress would not have enacted Section 110(k) so toothless.

The Secretary responds that settlement agreements "are a matter of public record and are subject to release under the Freedom of Information Act," which "imbues the Mine Act settlement process with the transparency that Congress intended." OB40. That assurance rings hollow. Reading the finalized settlement agreement does not substitute for examining the reasons for which the agreement

was reached. And what the operators agreed to do (*e.g.*, pay certain penalties) is only half the picture; what the Secretary agreed to do on her side of the bargain (*e.g.*, reduce the proposed penalties, or mitigate them by easing other sanctions) also matters. Blinkering the Commission's review to only one side would be like only allowing a financial auditor to review credits and not debits. To be meaningful, review of a penalty's compromise, mitigation, or settlement must "accord due consideration to the *entirety* of the proposed settlement package." JA361 (emphasis added) (quoting *AmCoal II*, 40 FMSHRC at 989).

### 2. The Commission's Review Does Not Violate The Secretary's Nonenforcement Discretion

The other main theme of the Secretary's brief is that principles of prosecutorial discretion compel insulating her contingent vacatur decisions from Commission review. Specifically, she points to her discretion (1) to initiate enforcement actions, (2) to dismiss unconditionally charges, and (3) to exercise autonomous judgment over the course of a prosecution. Of course, those generalized principles of discretion do not override a contrary command from Congress, *see Heckler*, 470 U.S. at 834-35, and so are largely beside the point of Section 110(k)'s scope. But even on their own terms, they do not support the Secretary's position here.

*First*, the Secretary draws a non sequitur from her discretion to initiate enforcement actions. She is right that the Mine Act "authorizes the Secretary to

issue citations and orders if [she] 'believes' or 'finds' that there are violations," and that deciding *not* to issue a citation is also her exclusive prerogative. OB49-50; *see* 30 U.S.C. § 814(a)-(e); *Twentymile Coal Co.*, 456 F.3d at 159-61. The Commission's orders did not question those propositions.

Once the Secretary has decided to issue a citation, however, it does not "stand[] to reason" that all future decisions about the citation's disposition must also be unreviewable. OB49. "It is commonplace in the law for an actor's choice to undertake a wholly discretionary course of action to give rise to a resulting non-discretionary duty that is governed by a manageable legal standard." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 756 (9th Cir. 2021). Section 110(k) is one of those places. It does not dictate whether the Secretary may issue a citation in the first place, or vacate it in a pre-assessment conference with mine operators. 30 C.F.R. § 100.6; *see Dickenson Russell Coal Co.*, 35 FMSHRC 519, 522 (2013). But if she later wishes to vacate the citation in a way that compromises, mitigates, or settles a contested penalty, she must seek approval from the Commission. That is the balance Congress has chosen.

*Second*, the Secretary misapplies the key precedents she cites as establishing her unreviewable discretion: *Cuyahoga Valley Railway Co. v. United Transportation Union*, 474 U.S. 3 (1985), and *RBK Construction, Inc*., 15 FMSHRC 2099 (1993). *See* OB36-42.

*Cuyahoga* arose from a contested OSH Act citation against a railway company. 474 U.S. at 4. The Secretary moved to vacate the citation based on a jurisdictional defect. *Id.* The Supreme Court held that the OSHRC could not review that vacatur. *Id.* at 5-6. The Court's decision rested on "the detailed statutory scheme" of the OSH Act, which imposed no limits on the Secretary's prosecutorial discretion. *Id.* at 6-7. The Court stressed that its holding was limited to "the statutory division of authority between the Secretary and the Commission" and did not reach the question "whether an agency's decision, resting on jurisdictional concerns, not to take enforcement action is presumptively immune from judicial review." *Id.* at 5 n.1.

The Court's holding in *Cuyahoga* does not control here because the OSH Act lacks any equivalent to the Mine Act's Section 110(k). The two statutes share many features, and so are helpful comparators in those respects. *See, e.g.*, *Twentymile Coal Co.*, 456 F.3d at 160-61. But as the Commission explained, "the Mine Act was intended to adopt the stronger features of the OSH Act while learning from areas where prior laws fell short." JA359 (collecting evidence from legislative history). Section 110(k) was one such improvement. JA359-60. So, whereas the OSH Act's "statutory division of authority" precluded review of the Secretary's vacatur decision, *Cuyahoga*, 474 U.S. at 5 n.1, here the Mine Act's divergent scheme requires it.

The Commission's decision in *RBK* is also inapposite. There, as in *Cuyahoga*, the Secretary moved to vacate all contested citations for jurisdictional defects. 15 FMSHRC at 2099. The ALJ saw no defects and attempted to block the vacatur, citing the Commission's prior decision in *Youghiogheny & Ohio Coal Co.*, 7 FMSHRC 200 (1985), which had held that dismissal required "adequate reasons." *Id*. at 2100-01. The Commission summarily reversed the ALJ. It acknowledged the *Cuyahoga* holding that the Secretary had "unreviewable discretion to withdraw a citation charging an employer with [an OSH Act] violation," and that the OSHRC "does not have the authority to overturn the Secretary's decision." *Id.* at 2101. "Based on that decision," the Commission overruled *Youghiogheny* and "agree[d] with the Secretary that he has the authority to vacate the citations in issue." *Id.* That is all it said.

Contrary to the Secretary's arguments, *RBK* did not import *Cuyahoga*'s OSH Act analysis wholesale into the Mine Act. Rather, it applied *Cuyahoga* to a context in which the Secretary's prosecutorial discretion was equally unfettered under both statutes: the unconditional dismissal of all citations. The *RBK* decision did not make a sweeping pronouncement about the Secretary's prosecutorial discretion in all circumstances. Instead, it tailored its holding to the Secretary's "authority to vacate the citations *in issue*" under those circumstances. *Id.* (emphasis added). And it

instructed that going forward, ALJs should implement such complete and unconditional dismissals by "dismissing the proceeding." *Id.* at 2101 n.2.

The Commission correctly declined to extend *RBK* to these cases. As it recognized, the vacaturs below were neither unconditional nor universal. Instead, they were part of a settlement agreement, offered in apparent exchange for the mine operators accepting other penalties. JA360-61. There is a world of difference between vacating all citations unconditionally—*e.g.*, for jurisdictional reasons, as in *Cuyahoga* and *RBK*—and using them as a bargaining chip. In the latter context, unlike in *RBK*, contested penalties are "compromised, mitigated, or settled" in exactly the kind of deal between the Secretary and operators that Congress decided to make more accountable through Commission review. When the Secretary voluntarily dismisses an entire proceeding, by contrast, there are no mutual concessions, softened sanctions, or appearances of an invalid *quid pro quo* that trigger Section 110(k)'s requirements.

The Secretary badly errs, therefore, in claiming that the only difference between unconditional, complete dismissals and contingent, piecemeal vacaturs in settlements is the amount of "paperwork" they require. OB54. The fundamental distinctions between those two situations far surpass "the title of a document" or "whether she files two pleadings instead of one." *Id.* By enacting Section 110(k),

Congress decided that her discretion to vacate contested citations would, in fact, be "context-dependent." OB41.

*Third*, the Secretary objects that requiring approval for settlement-contingent vacaturs will unfairly subordinate her to the Commission's policy views. OB37-38, 53, 55-56. But the Commission has never claimed a policymaking role, and the orders below do not change that. To the contrary, the Commission has stressed that it applies the highest possible deference to the Secretary's requests for approval. "If any relevant circumstances exist to plausibly suggest" a penalty should be compromised, mitigated, or settled, "all the Secretary needs to do is provide justification . . . in her settlement motion—and her motion must be granted." *Knight Hawk Coal, LLC*, 46 FMSHRC at 573 (collecting cases). That is not a difficult bar to clear, as the proceedings below demonstrate. The ALJ explained to the Secretary that it "would be sufficient for the parties to certify that the decision to vacate the citation as provided in the Motion is coincidental and not contingent upon the dismissal of the remaining violations." JA112.

The Commission's deferential review obviates any concern about situations where it is "necessary to vacate a citation," but "the Commission . . . prevent[s] the Secretary" from doing so. OB55-56.[7] If "additional facts that necessitate a change"

---

[7] This is the primary concern behind the Secretary's references to the Equal Access Justice Act. OB56 n.9.

come to light after a penalty, *id.* at 55, the Secretary can simply provide those facts publicly in requesting Commission approval. And if the Secretary believes that the Commission has strayed from its deferential standard in applying overly strict scrutiny to her justifications for contingent vacaturs, she can seek relief from this Court. *See Consolidation Coal Co.*, 895 F.3d at 119 (vacating an order that failed to follow Commission precedent). The Secretary's prosecutorial discretion, as defined by Congress, remains fully intact.

## CONCLUSION

*Amicus* submits that the Court should (1) direct the Commission to participate in this case and (2) either dismiss or deny the petitions for review.

Dated: December 22, 2025

Respectfully submitted,

*/s/ Soren J. Schmidt*
Soren J. Schmidt[*]
  *Counsel of Record*
Patrick D. Powers
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
soren.schmidt@lw.com

*Court-Appointed Amicus Curiae*

---

[*]  Supervised by Gregory G. Garre, Partner, Latham & Watkins LLP.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,897 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

December 22, 2025

*/s/ Soren J. Schmidt*
Soren J. Schmidt

*Court-Appointed Amicus Curiae*